## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

SHAWN PRATHER                                    CIVIL ACTION

V.                                               23-1349-SDD-RLB

EAST BATON ROUGE PARISH
SCHOOL BOARD and RICHARD
DAY, individually and in his official
capacity

## <u>RULING</u>

This matter is before the Court on a Motions for Summary Judgment filed by Defendant Richard Day ("Day")[1] and Defendant East Baton Rouge Parish School Board (the "School Board"),[2] respectively. Plaintiff, Shawn Prather ("Plaintiff"), opposed both Motions,[3] and Day and the School Board filed Replies.[4] For the following reasons, the Court will grant Day's motion, and it will grant the School Board's motion as to the federal claims but deny its motion as to the state law claims.

## I.    BACKGROUND[5]

This action arises out of sexual abuse Plaintiff endured as minor student at Southeast Middle School ("Southeast") in Baton Rouge, Louisiana in May of 1985. At that time, Plaintiff was in seventh grade, Rafe Davison ("Davison") was a science teacher, and Day was the principal of Southeast.[6] Plaintiff's initial interactions with Davison were limited

---

[1] Rec. Doc. 65.
[2] Rec. Doc. 66.
[3] Rec. Docs. 70, 71.
[4] Rec. Docs. 73, 74.
[5] To avoid confusion, when citing deposition testimony, the Court will refer to the page number of the deposition transcript, not the ECF number assigned by CM/ECF.
[6] Rec. Doc. 1.

to casual greetings like "Good morning," and "how are you doing."[7]  Plaintiff testified that, back then, he never felt uncomfortable in Davison's presence and had never heard of Davison engaging inappropriately with students.[8]

The first time Davison abused Plaintiff was on May 14, 1985 during Plaintiff's seventh period gym class.[9] After leaving gym class to use the restroom, Plaintiff was called into Davison's classroom and then sexually assaulted by Davison.[10]  Specifically, Plaintiff testified that once Davison had him alone in his classroom, Davison closed the door and grabbed Plaintiff, placed him in a "bear hug" and then pushed him up against the back of the door of the classroom.  Davison lifted him up such that his feet were not touching the ground. Davison proceeded to forcefully kiss Plaintiff, and then he lowered Plaintiff down, grabbed his face, and pushed his cheeks to a position requiring Plaintiff to open his mouth.  Davison then started French kissing Plaintiff and told him that was the way people showed they love each other. Davison then stopped kissing Plaintiff and with one hand covering Plaintiff's collarbone and throat area, he removed Plaintiff's underwear with his other hand.  Davison proceeded to perform oral sex on Plaintiff.[11]  Following this assault, Davison provided Plaintiff with a hall pass to return to P.E. class.[12]

Larry Stallings ("Stallings"), another student, briefly entered Davison's classroom while this assault occurred, and Davison angrily asked Stallings for a hall pass and ordered Stallings to return to class when he could not present one.[13] Plaintiff later disclosed part of the assault to Stallings and then Plaintiff's mother, who contacted the

---

[7] Rec. Doc. 65-2, Plaintiff Depo. p. 90.
[8] *Id.* at pp. 90, 93.
[9] *Id.* at p. 93.
[10] *Id.* at p. 94-96.
[11] *Id.* at pp. 95-96.
[12] *Id.* at pp. 96, 101.
[13] *Id.* at pp. 94-95.

police.[14]  Detectives arrived at Plaintiff's home that evening and questioned him about the incident.[15] However, Plaintiff only told them that Davison forcefully hugged and French kissed him; he did not report the oral sex.[16]

A Police Report was prepared by the detectives.[17] Although the Police Report is dated May 20, 1985, it also makes clear that the date of the incident was May 14, 1985, and it reflects that the police began their investigation by taking Plaintiff's statement in his home the night of the incident.[18]  Although the Police Report is redacted where the minor children were identified – Plaintiff and Stallings – it is easily inferred that the detectives left Plaintiff's home and "proceeded" to interview Stallings in the presence of his mother on May 14, 1985, the date of the incident.[19]  The report indicates that, following Stalling's interview, the police "proceeded to obtain more information" about Davison and "then proceeded to contact Mr. Richard Day, Principal of Southeast Middle School to advise him of the above investigation."[20]  However, since Day was not home, the detectives "contacted" Day "early the next day" and advised him of the investigation.[21]  Plaintiff contends the report demonstrates that Day was notified of the investigation "the next day" after the incident – May 15, 1985.[22]  Day maintains the actual dates of interviews are not specified, and, because the report references many different dates, it cannot be conclusively determined that Day was contacted by the detectives on May 15, 1985.[23]

---

[14] *Id.* at pp. 97-98.
[15] *Id.* at pp. 98-99.
[16] *Id.* at pp. 98-99; Rec. Doc. 65-3, p. 4.
[17] The Court notes that the Police Report is virtually the only available contemporaneous evidence of the events.  Although it is hearsay, all parties have relied on it, without objection, as substantive evidence.
[18] Rec. Doc. 65-3.
[19] *Id.* at p 5.
[20] *Id.* at pp. 5-6.
[21] *Id.*
[22] Rec. Doc. 71-2, p. 9.
[23] Rec. Doc. 74-1, p. 4.

Day testified that when he was contacted by the detectives, he could not recall being advised of the specifics of the complaint against Davison, just that they were investigating a complaint against Davison and asked if Day had any knowledge of the facts.[24] Day further testified, and the Police Report reflects, that Day advised the detectives about a meeting that occurred when Southeast first opened, 10 or 11 years prior, which included the Assistant Superintendent of Schools Lorin Smiley ("Smiley"), the Southeast administration, and a detective, to address parent complaints about Davison and the "strange" comments he made to neighborhood children.[25]  Day was also made aware by other teachers (who previously worked with Davison at Istrouma Junior High) of rumors about Davison's purported homosexuality and that "he's got a reputation and all that."[26]

Although Day testified that the police investigating Plaintiff's complaint never advised him of names or specifics about the incident, Day acknowledged that he understood the nature of the matter being investigated involved the "possibility" of inappropriate sexual behavior with a minor.[27]  Day maintains that the police did not advise him that the investigation involved a student at Southeast, but he acknowledges they advised him it involved a child.[28]

When asked how Day supervised Davison over the years in light of the 1974 rumors, Day testified that, when he returned to Southeast in an administrative role, he supervised Davison by "[j]ust seeing him and telling him, Rafe, keep it straight, don't

---

[24] Rec. Doc. 65-4, Day Depo, p. 155.
[25] *Id.* at p. 154; Rec. Doc. 65-3, pp. 5-6.
[26] Rec. Doc. 65-4, p. 181, 185.
[27] *Id.* at pp. 185-186.
[28] *Id.* at pp. 186-187.

involve yourself with any relationship with any students, you know.  And that was the same thing we told him every year basically, at least, you know, that I was aware of."[29]

On May 15, 1985, Plaintiff saw Davison at school. Plaintiff waved and said good morning. Davison called him over to the side of the classroom door and asked Plaintiff if he had told anyone about the sexual abuse that occurred the previous day; Plaintiff said no. Plaintiff testified that he was scared for his life. Later, Plaintiff waved goodbye to Davison before getting on the bus at the end of the school day.[30]

On May 16, 1985, while Plaintiff was in Ms. Wicker's class, Ms. Wicker advised Plaintiff that Davison requested to see him in his classroom; Plaintiff complied and went to Davison's classroom. Once in the classroom, Davison closed the door, lifted Plaintiff onto the desk, kissed him again, pushed Plaintiff's back toward the table, and held Plaintiff's crotch to make him erect. Davison told Plaintiff that "he would make a lot of guys happy with that" referring to Plaintiff's penis. Davison held Plaintiff's chest down and said he had a new way to make Plaintiff feel better, then he pulled Plaintiff's pants down and began performing oral sex on him while using his fingers to rub Plaintiff's anus. Davison spit on his fingers and inserted one into Plaintiff's anus, then alternated between sucking his fingers and sucking Plaintiff's penis. Davison continued to digitally rape Plaintiff, inserting two fingers and pushing higher up against Plaintiff's prostate, causing damage that made Plaintiff begin to bleed.  At that point, Davison stopped.[31]

On May 20, 1985, when Plaintiff arrived at school, Davison pulled him aside and asked about his weekend. Plaintiff told Davison he spent the weekend drawing in his

---

[29] *Id.* at p. 125.
[30] Rec. Doc. 65-2, pp. 104-105.
[31] Rec. Doc. 65-2, pp. 107-110.

room, and Davison said he wanted to see the drawings, which Plaintiff kept at home in a large sketchbook. Davison told Plaintiff that he could bring Plaintiff home to his apartment, which alarmed Plaintiff because he could not understand how Davison knew he lived in an apartment. Davison then asked if Plaintiff had told anyone about the abuse, to which Plaintiff said no.[32]

On May 21, 1985, Plaintiff testified that Ms. Wicker again told him that Davison needed to see him in his classroom. Plaintiff went to Davison's classroom, and he was sexually assaulted again. Davison placed Plaintiff on the table and raped him in the same manner as before. However, this time, Plaintiff bled profusely and asked Davison to please stop. Plaintiff testified that during this assault, he thought – "Why doesn't anyone believe me? Why hasn't anyone stopped him from doing this to me?"[33]

On the morning of May 22, 1985, Plaintiff and Davison had a similar "good morning" type of verbal interaction as on May 20.  This was the last interaction between them.[34]

According to the Police Report, on May 23, 1985, "[u]pon arriving at Southeast Middle School, this detective proceeded to the Administrative Office and contacted Mr. Richard Day, Principal. Mr. Day was fully informed of the above investigation and of the need to talk with Mr. Rafe Davison. Mr. Day was fully cooperative in obtaining a substitute teacher for the time Mr. Davison would be interviewed."[35] During the interview, Davison initially denied the accusations; however, upon being confronted with the handwritten note excusing Plaintiff from class, Davison admitted that on May 14, 1985, he kissed Plaintiff

---

[32] *Id.* at pp. 116-117.
[33] *Id.* at pp. 117-118.
[34] *Id.* at pp. 119-120.
[35] Rec. Doc. 65-3, p. 7.

on the mouth in his classroom.[36] During the interview, Davison admitted to having a personal attraction to Plaintiff, acknowledged that he had done wrong, and said that he would like to get some "help" for his "problem."[37] Following the interview, Davison was taken into custody by police.[38]

Day vividly recalled witnessing Davison admit to the allegations.[39] On the day of the arrest, after school was over, Day called a faculty meeting wherein he announced Davison's arrest. Following the announcement, Sharon Story, a teacher at Southeast who had previously taught with Davison at Istrouma, approached Day and said, "It's about time." A second teacher, Irene Smith, who also taught with Davison at Istrouma, made a similar comment to Day that "[t]hey finally caught up with him" in reference to Davison.[40]

During his decades of employment with the School Board, Day cannot recall ever receiving training regarding sexual abuse or suspected sexual abuse of students or children.[41] Day cannot recall ever receiving information relating to rules or regulations regarding sexual relationships with students.[42] Day could not recall whether the School Board employee handbook he received during the relevant time period mentioned sexual abuse.[43] Day could not recall any School Board policy regarding reporting or investigating suspicions of child sexual abuse.[44]

When Day left teaching and began administrative roles with the School Board, he

---

[36] *Id.* at pp. 7-8.
[37] *Id.* at p. 8.
[38] *Id.*
[39] Rec. Doc. 65-4, pp. 165-167.
[40] *Id.* at pp. 170-171.
[41] Rec. Doc. 65-4, p. 91; Rec. Doc. 71-1, pp. 308-316.
[42] Rec. Doc. 65-4, pp. 43-44; Rec. Doc. 71-1, pp. 308-316.
[43] Rec. Doc. 65-4, p. 91; Rec. Doc. 71-1, pp. 308-316.
[44] Rec. Doc. 65-4, p. 122; Rec. Doc. 71-1, pp. 308-316.

received no additional training.[45] Day acknowledged that he was given a test in 1967 or 1968 to become an administrator, but the subject matter of the test had nothing to do with administrative responsibilities.[46]

Gwynn Shamlin ("Shamlin"), current General Counsel for the School Board, appeared for a Rule 30(b)(6) deposition on behalf of the School Board.[47] When Shamlin was originally hired by the School Board as a teacher, he did not recall receiving any training relating to investigation into sexual abuse of students.[48]

Plaintiff cites Shamlin's general testimony, arguing that the following facts are "undisputed."[49] According to the School Board, what Davison did to Plaintiff should not have happened.[50] The School Board had a responsibility to protect Plaintiff from sexual abuse by his teacher.[51] All students have a right to be free from sexual abuse by their teachers and that was true in 1985.[52] Since before 1985, the School Board had the responsibility to investigate suspicions of child sexual abuse by its teachers.[53] Further, the School Board had a responsibility not to retain an employee who poses a potential danger to the students in their care.[54] By at least 1974, when it learns that a School System is being investigated by law enforcement, the School Board should ask questions of law enforcement to determine how to protect its students.[55] The School Board also has

---

[45] Rec. Doc. 65-4, pp. 62, 82, 88-89; Rec. Doc. 71-1, pp. 308-316.
[46] Rec. Doc. 65-4, pp. 29-31; Rec. Doc. 71-1, pp. 308-316.
[47] Rec. Doc. 71-1, Shamlin Depo.
[48] Rec. Doc. 71-1, p. 25.
[49] Many of the following statements are more appropriately characterized as arguments and/or opinions rather than established facts, but the Court will interpret them in the light most favorable to Plaintiff.
[50] *Id.* at p. 56.
[51] *Id.* at pp. 56-57.
[52] *Id.* at p. 57.
[53] *Id.*
[54] *Id.* at pp. 57-58.
[55] *Id.* at pp. 60-61.

a duty to supervise an employee about whom it has information concerning that employee's inappropriate sexual conduct with children, at a minimum.[56]

If law enforcement goes to a school and informs the principal that they suspect a teacher at the school is having inappropriate sexual contact with children, not necessarily a student, that it is a serious situation that the principal should bring to the School Board superintendent.[57] Even rumors that a teacher is having inappropriate sexual contact with children, whether students or not, should be brought to the superintendent's attention.[58] If advised by law enforcement that a teacher is suspected of engaging in inappropriate sexual contact with children, the principal should advise the teacher being investigated and devise a plan that would deter this behavior.[59] If law enforcement goes to a school and advises the principal that they are investigating a teacher's inappropriate sexual conduct with a child, it is reasonable for the principal to assume it is about a student.[60]

The School Board denies that the above statements from Shamlin's testimony are undisputed:

> Plaintiff's statement[s] [are] elicited from testimony of Mr. Shamlin, which reflects a combination of personal opinion and his understanding as General Counsel, rather than firsthand knowledge of events in 1985. He expressly testified that he cannot speak to what policies were in place at that point. He was not a representative of the School Board at the time of the alleged incidents and therefore cannot provide competent evidence of what the School Board believed or maintained in 1985. Any testimony regarding students' rights or the responsibilities of the School Board in 1985 reflects the witness's present-day understanding, not personal knowledge of the School Board's policies and practices at that time.[61]

---

[56] *Id.* at p. 61.
[57] *Id.* at p. 229.
[58] *Id.*
[59] *Id.* at p. 231.
[60] *Id.* at p. 232.
[61] Rec. Doc. 74-1, p. 10 (citing Rec. Doc. 71-1, pp. 11, 31). The cited pages of Shamlin's testimony do not support the statements offered by the School Board; however, Shamlin did testify generally throughout his deposition that he had no knowledge of School Board policy in 1985, and he could not speak for the School

Today, the School Board has policies in place to protect students from potential sexual abuse, including a policy that no School Board employee should be alone with a student in a classroom or other enclosed area on school property unless an authorized adult is present during the full time of the interaction, or the student and the employee are clearly visible by persons outside of the area through either an open door or entrance or through a window or other means that provides an unobstructed view of the student and that employee.[62]  Plaintiff takes the position, based on Shamlin's testimony, that there is no reason this policy could not have been implemented back in 1985.[63]  However, the School Board contends that this testimony "reflects a combination of personal opinion and his current understanding as General Counsel, rather than firsthand knowledge of events in 1985."  Further, Shamlin "expressly testified that he cannot speak to what policies were in place at that point. He was not a representative of the School Board at the time of the alleged incidents and therefore cannot provide competent evidence of what the School Board should have done or its contemporaneous views regarding what policies should have been in place."[64]

Plaintiff offers as an undisputed fact that the School Board was aware of four prior incidents of sexual misconduct with minors by School Board employees between 1980 and 1985.[65]  However, the School Board responds that its "acknowledgment of four prior incidents of alleged sexual misconduct by employees between 1980 and 1985 reflects its

---

Board's policy decisions and actions back then. *See* Rec. Doc. 71-1, pp. 50-53, 62, 64-65, 67, 91-93, 106, 117, 138, 144-150, 158, 166, 169-172, 175, 207, 210-214, 217, 218, 228, 238, 245.
[62] Rec. Doc. 71-1, p. 216.
[63] *Id.* at p. 218
[64] Rec. Doc. 74-1, p. 17. The actual policies in place in 1985 appear to be unavailable.
[65] Rec. Doc. 71-2, p. 18.

current awareness, after Plaintiff produced newspaper articles regarding these allegations. Such post-litigation awareness does not establish that the allegations were substantiated, nor does it demonstrate that the School Board had actual notice of these incidents prior to the subject events."[66] The School Board objects to this evidence, arguing that the news articles are hearsay and inadmissible summary judgment evidence. The School Board is correct. The Fifth Circuit has ruled that "[n]ewspaper articles, however, are not proper summary judgment evidence to prove the truth of the facts that they report because they are inadmissible hearsay."[67] Accordingly, the Court will not consider facts offered by Plaintiff that are supported only by inadmissible news articles.

## II.    LAW & ANALYSIS

### A.  Rule 56 Summary Judgment Standard

In reviewing a party's motion for summary judgment, the Court will grant the motion if (1) there is no genuine issue of material fact, and (2) the mover is entitled to judgment as a matter of law.[68] This determination is made "in the light most favorable to the opposing party."[69] A party moving for summary judgment "'must "demonstrate the absence of a genuine issue of material fact," but need not negate the elements of the nonmovant's case.'"[70] If the moving party satisfies its burden, "the non-moving party must show that summary judgment is inappropriate by setting 'forth specific facts showing the

---

[66] Rec. Doc. 74-1, p. 19.
[67] *James v. Texas Collin Cty,* 535 F.3d 365, 374 (5th Cir. 2008).
[68] FED. R. CIV. P. 56(a).
[69] *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); 6 V. MOORE, FEDERAL PRACTICE 56.15(3) (2d ed. 1966)).
[70] *Guerin v. Pointe Coupee Parish Nursing Home*, 246 F.Supp.2d 488, 494 (M.D. La. 2003) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986).

existence of a genuine issue concerning every essential component of its case.'"[71] However, the non-moving party's burden "'is not satisfied with some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'"[72]

Notably, "[a] genuine issue of material fact exists, 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"[73] All reasonable factual inferences are drawn in favor of the nonmoving party.[74] However, "[t]he Court has no duty to search the record for material fact issues. Rather, the party opposing the summary judgment is required to identify specific evidence in the record and to articulate precisely how this evidence supports his claim."[75] "Conclusory allegations unsupported by specific facts . . . will not prevent the award of summary judgment; 'the plaintiffs [can]not rest on his allegations . . . to get to a jury without any "significant probative evidence tending to support the complaint.'""[76]

### B. Principal Day's Motion for Summary Judgment Under 42 U.S.C. § 1983

The Civil Rights Act of 1964, 42 U.S.C. § 1983, creates a private right of action for redressing the violation of federal law by those acting under color of state law.[77] It provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any

---

[71] *Rivera v. Houston Indep. Sch. Dist.,* 349 F.3d 244, 247 (5th Cir. 2003) (quoting *Morris v. Covan World Wide Moving, Inc.,* 144 F.3d 377, 380 (5th Cir. 1998)).

[72] *Willis v. Roche Biomedical Lab., Inc.,* 61 F.3d 313, 315 (5th Cir. 1995) (quoting *Little,* 37 F.3d at 1075).

[73] *Pylant v. Hartford Life and Accident Insurance Company,* 497 F.3d 536, 538 (5th Cir. 2007) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

[74] *Galindo v. Precision American Corp.,* 754 F.2d 1212, 1216 (5th Cir. 1985).

[75] *RSR Corp. v. Int'l Ins. Co.,* 612 F.3d 851, 857 (5th Cir. 2010).

[76] *Nat'l Ass'n of Gov't Emps. v. City Pub. Serv. Bd. of San Antonio, Tex.,* 40 F.3d 698, 713 (5th Cir. 1994) (quoting *Anderson,* 477 U.S. at 249).

[77] *See Migra v. Warren City School District Board of Educ.,* 465 U.S. 75, 82 (1984); *Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n,* 453 U.S. 1, 19 (1981).

citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured....[78]

"Section 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights conferred elsewhere.'"[79] To prevail on a § 1983 claim, a plaintiff must prove that a person acting under the color of state law deprived him of a right secured by the Constitution or laws of the United States.[80]

Plaintiff asserts a claim against Day in his individual capacity, arguing that he is liable for Davison's violating Plaintiff's Fourteenth Amendment rights via supervisory actions or omissions, including failure to investigate, train, or supervise. Day asserts the defense of qualified immunity in response to Plaintiff's claims against him pursuant to 42 U.S.C. § 1983.[81] Public officials are entitled to qualified immunity unless the plaintiff demonstrates that (1) the defendant violated an actual constitutional or federal statutory right that is clearly established under existing law, and (2) if so, that the defendant's conduct was objectively unreasonable in light of clearly established law at the time of that conduct.[82] If the court determines that there was a violation of a right secured by the Constitution, then it must determine whether the defendant could have reasonably thought his actions were consistent with the rights they are alleged to have violated.[83]

---

[78] 42 U.S.C. § 1983.

[79] *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n. 3, (1979)); *accord Graham v. Connor*, 490 U.S. 386, 393–94 (1989); *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985); *Jackson v. City of Atlanta, TX*, 73 F.3d 60, 63 (5th Cir.), *cert. denied*, 519 U.S. 818 (1996); *Young v. City of Killeen*, 775 F.2d 1349, 1352 (5th Cir.1985).

[80] *See Blessing v. Freestone,* 520 U.S. 329, 340 (1997); *Daniels v. Williams,* 474 U.S. 327, 330 (1986); *Augustine v. Doe*, 740 F.2d 322, 324–25 (5th Cir.1984).

[81] *Haley v. DeSoto Par. Sch. Bd.*, CV 20-0476, 2021 WL 261273, at *5 (W.D. La. Jan. 26, 2021) ("[Qualified immunity and statutory immunity are not synonymous. A party must meet the requirements of each individual immunity in order to enjoy its protection.").

[82] *Porter v. Epps*, 659 F.3d 440, 445 (5th Cir. 2011); *Hart v. Tex. Dep't of Criminal Justice*, 106 F. App'x 244, 248 (5th Cir. 2004).

[83] *Anderson v. Creighton*, 483 U.S. 635, 638 (1987).

The protections afforded by the qualified immunity defense turn on the "objective legal reasonableness" of the defendant's conduct examined by reference to clearly established law.[84]

The Fifth Circuit has "held as early as 1981 that '[t]he right to be free of state-occasioned damage to a person's bodily integrity is protected by the fourteenth amendment guarantee of due process.'"[85] Although a school official cannot be held vicariously liable for the acts of a subordinate under § 1983, the school official's liability can arise when it is shown that their action or inaction demonstrates a deliberate indifference to a student's constitutional rights.[86]

The Fifth Circuit adopted the following test to determine the personal liability of school officials in cases involving a subordinate's sexual abuse of a minor student:

A supervisory school official can be held personally liable for a subordinate's violation of an elementary or secondary school student's constitutional right to bodily integrity in physical sexual abuse cases if the plaintiff establishes that:

(1) the defendant learned of facts or a pattern of inappropriate sexual behavior by a subordinate pointing plainly toward the conclusion that the subordinate was sexually abusing the student; and

(2) the defendant demonstrated deliberate indifference toward the constitutional rights of the student by failing to take action that was obviously necessary to prevent or stop the abuse; and

(3) such failure caused a constitutional injury to the student.[87]

---

[84] *Id.* at 639.

[85] *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 450–51 (5th Cir.1994). The Fifth Circuit also found that it was clearly established in 1985 that the Due Process Clause protects a schoolchild from being lashed to a chair for "instructional purposes" and that similar egregious and outrageous conduct, such as sexually molesting a minor student, could not be assumed to be met with constitutional immunity. Additionally, a school official could not have reasonably believed that he could be deliberately indifferent to subordinate's violation of a constitutional rights in this manner and escape liability under § 1983. *Id.* at 450–56.

[86] *Id.; See Monell*, 436 U.S. at 691.

[87] *Evans v. St. Bernard Par. Sch. Bd.*, 03-379, 2004 WL 737493, at *3 (E.D. La. Apr. 5, 2004) (citing *Hagan v. Houston Indep. Sch. Dist.*, 51 F.3d 48 (5th Cir.1995)).

Day moves for summary judgment, arguing he is entitled to qualified immunity because there is no competent summary judgment evidence that he learned of facts pointing plainly towards the risk of sexual abuse by Davison. Day notes that the assaults on Plaintiff by Davison occurred on May 15, May 16, and May 21, 1985, and Day had no actual knowledge or reason to suspect that Davison had engaged in similar conduct prior to May 23, 1985. Day contends the rumors going around in 1974 had only to do with Davison's sexuality and not that he was sexually abusing children.[88] Day testified that, when he asked Assistant Superintendent Smiley if there had been any incidents involving Davison at school, Smiley responded, "[t]here's no known incidents or anything that happened."[89] Day points to Plaintiff's testimony that even he had never experienced uncomfortable or upsetting interactions with Davison prior to the initial assault, and he had never heard of Davison engaging in inappropriate behavior with any other students.[90]

Despite no concrete allegations suggesting misconduct by Davison, Day contends that over the next several years, he periodically checked in with Davison to ask if he was having any issues, and he was never advised of any problems.[91] Further, during this time span, Day never received a single complaint about Davison from students, parents, or staff.[92] When Day returned to Southeast in 1984, he asked another administrator, Joe Maggio, whether there was anything he needed to know about Davison, to which Maggio responded, "everything is going smoothly."[93] Thus, Day argues the summary judgment record reveals no evidence available to Day prior to May 14, 1985 that pointed plainly to

---

[88] Rec. Doc. 65-4, pp. 126-128.
[89] *Id.*
[90] Rec. Doc. 65-2, pp. 90, 93.
[91] Rec. Doc. 65-4, p. 128.
[92] *Id.*
[93] *Id.*

Davison as a risk of sexual abuse.

Day maintains that, even when the police contacted him after the first report of abuse in May 1985, he was not apprised by the detectives that the reported misconduct was sexual in nature. Day testified the detectives stated only that they were "looking into a matter," and they "did not specifically tell [him] that it involved a student of [his]."[94] Day claims it was not until May 23, 1985 that he "was fully informed of the above investigation and of the need to talk with Mr. Rafe Davison."[95] Day insists the Police Report does not establish that he learned of facts pointing plainly to the sexual abuse of Plaintiff or any other student prior to May 23, 1985.

Plaintiff opposes Day's motion, arguing that, even setting aside the rumors about Davison from 1974, Day knew early on May 15, 1984, when the detectives questioned him about Plaintiff's initial report against Davison, that Davison was being investigated for "the very sexually inappropriate conduct with children that had concerned him and the School Board since 1974."[96] Plaintiff claims the fact that Day did nothing in response to this notice demonstrates deliberate indifference to a known risk and resulted in two further violations of Plaintiff's bodily integrity. Plaintiff rejects the notion that, because the detectives did not provide Day names or specify that the child involved in the investigation was a Southeast student, Day had no responsibility to increase his supervision of Davison and take steps to protect his students.

Plaintiff argues that Day had knowledge of Davison's questionable conduct with children back in 1974, not just from rumors, but from law enforcement's contact with the

---

[94] Rec. Doc. 65-4, pp. 155, 183, 185-186,
[95] Rec. Doc. 65-3.
[96] Rec. Doc. 71, pp. 14-15.

School Board and also on May 15, 1985, when law enforcement contacted Day about Plaintiff's report.  Day knew that the 1985 investigation involved Davison's conduct with a child. Plaintiff contends the detectives provided Day enough information in May 1985 for Day to draw the inference that the crimes being investigated were sexual in nature, even if that was not specifically communicated. Day's testimony confirms this.[97]  Thus, because Day was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed, and he drew the inference, the Court can infer that the substantial risk of serious harm was obvious.[98]

Plaintiff also refers to the Police Report, which reflects that Day advised the detectives in May 1985 about the 1974 school board meeting regarding Davison's conduct. The Police Report reads:

> Day advised this detective that approximately 10 to 11 years ago when Southeast Middle School was opened, a meeting was held with a detective, along with the Assistant Superintendent of Schools and also Southeast Middle School Administrators.  The purpose of that meeting was to discuss happenings in the neighborhood and complaints from parents, also in the neighborhood, on a teacher by the name of Rafe N. Davison.

> Mr. Day advised that he did not remember the extent of their conversation, but did state that Mr. Davison's name has come up before in these related type incidents, either from his subdivision, where Mr. Davison lives or from students around school, saying that Mr. Davison makes strange comments to different students.[99]

Plaintiff points out that the Police Report does not reflect that Day advised the detective that the 1974 meeting concerned rumors that Davison was gay; rather, Day advised the detective that it involved Davison's inappropriate conduct with children, which

---

[97] Rec. Doc. 65-4, pp. 176-180, 184-188. Day assumed the nature of the investigation was possibly sexual in nature. *Id.* at pp. 187-188.
[98] *Moreno v. McAllen Ind. Sch. Dist.*, No. 7:15-CV-162, 2016 WL 3198159, at *12 (S.D. Tex. June 9, 2016)(citing *Rosa H. v. San Elizario Indep. Sch. Dist.*, 106 F.3d 648, 658 (5th Cir. 1997)).
[99] Rec. Doc. 65-3, pp. 5-6.

demonstrates that Day has been aware since that time of the existing risk of harm Davison poses with children. Thus, Plaintiff maintains Day was at least aware of the serious risk of harm posed by Davison during his meeting with the police in May 1985.

Plaintiff contends Day was deliberately indifferent to this known risk to students' health and safety and did absolutely nothing to ameliorate this risk. After the police met with Day in 1985, Plaintiff contends Day could have notified Davison that he was being watched and could have advised Davison that he was to leave his classroom door open and not to be alone with students. That Day failed to take a single precautionary measure in light of this knowledge shows deliberate indifference.

Plaintiff distinguishes the cases Day relies on where courts found qualified immunity was established on behalf of school principals, arguing that in those cases, the principals actually did something with their knowledge by taking some preventative action, giving a verbal warning or reprimand, or suspending the alleged abuser; here, Davison did nothing at all. Plaintiff posits that, if the mere "rumors" about Davison from 1974 warranted Day to periodically "check in" with Davison and ask questions about his conduct with students, at the very least, the notice Day received on May 15, 1985 - that Davison was being investigated criminally due to conduct with a minor - should have warranted some immediate response or measure to protect the students of Southeast Middle.

Day counters that Plaintiff has mischaracterized his testimony and that the record evidence, considered in context, demonstrates that Day never received any specific report about Davison and misconduct with any student at Southeast, and no credible allegations of sexual misconduct were ever plainly communicated to Day. Day contends

Plaintiff seeks to place liability on him for failing to act on conjecture that the police did not even act on after Plaintiff's first report. Although the police did not arrest Davison, identify a victim, or conclude that Davison posed any threat to students after Plaintiff's initial report, Plaintiff demands that Day should have reacted at a higher level than the police. Finally, Day maintains that there is no evidence that his purported inaction was the moving force behind Plaintiff's assault. Because Plaintiff concedes Davison's sexual misconduct occurred in secret, outside Day's presence, and without any prior complaint or report, there is no evidence that Day knew of any ongoing or imminent risk that rendered some action "obviously necessary."

Although the Court finds several genuine disputes of material fact are present in this case, the Court holds that Day is entitled to qualified immunity after applying the overwhelming jurisprudence that mandates this result. The Court will review the disputed facts.

In the Court's view, Day places undue emphasis on the distinction between a child generally and one of his students in determining whether he was obliged to act. Day seems to suggest that he only had an obligation to take some action if a Southeast student was involved. The Court finds that a reasonable jury could draw the inference that any misconduct with a minor child by Davison necessarily put Day on notice that Davison posed a risk to *all* children, including the students under his authority. While Day argues that earlier rumors about Davison related only to his sexuality and strange behavior with neighborhood children not sexual in nature, there is evidence in the record from which a reasonable jury could draw the inference that Day was on notice that Davison might pose a risk of sexual misconduct with students.

First, although Day characterized these old complaints as rumors, they were treated seriously enough for law enforcement to contact the School Board in 1974. Second, the issue prompted Day to periodically ask Davison if there were any problems over the next few years. Third, when Day returned to Southeast as principal in 1984, he asked Maggio specifically about issues with Davison. Although Maggio reported no problems, Day admonished Davison to "keep it straight," and pointedly told him "*don't involve yourself with any relationships with students*."[100] Day testified they told Davison this every year. Fourth, the 1985 Police Report reflects that, when questioned about Plaintiff's initial report, Day recounted the School Board meeting with the detective about Davison back in 1974, and the Police Report characterized this as "related type incidents." There was no mention in the Police Report of rumors about Davison's sexuality, only prior complaints about his behavior with children.  Even if the detectives did not explicitly state the crime being investigated was sexual in nature, a reasonable jury could conclude that a criminal investigation implied sexual misconduct. The jury might also conclude Day was aware of this implication, particularly because Day warned Davison against "relationships with students," which carries its own suggestion of sexual misconduct with minors. Day admitted as much during his deposition when he acknowledged that he assumed the 1985 complaint was possibly sexual in nature.[101]  When asked if the police told him the reason for the investigation was a complaint of a sexual offense, Day responded, "They never did tell me it was about a student at Southeast Middle[,] … I probably assumed that that was what it was concerning, but they never told me like the names or whatever."[102]

---

[100] Rec. Doc. 65-4, p. 125 (emphasis added).
[101] *Id.* at pp. 187-88.
[102] *Id.* at p. 188.

The timing of when Day obtained knowledge of Davison's alleged crime is also disputed. Day maintains he did not have actual knowledge that Davison posed a risk of sexual harm to students until May 23, 1985, the date Davison was arrested at school. Day also claims, for notice purposes, that the reference to several dates within the Police Report, including being dated and signed on May 20, 1985, makes it impossible to know on what date the police actually met with Day about Plaintiff's initial complaint. However, the Court finds that a reasonable jury could conclude that the Police Report means what it says: that the police attempted to contact Day on the date of the complaint, but he was unavailable until "the next day" - May 15, 1985. This issue goes to notice and causation, since Plaintiff argues that if Day had acted on this knowledge, the subsequent sexual assaults of May 16 and May 21, 1985 would not have occurred. Because all parties rely on the Police Report to support their respective positions, the Court finds that it would be the jury's role to interpret the Police Report.

Nevertheless, even resolving these factual disputes in the light most favorable to Plaintiff as the Court is required to do at the summary judgment stage, the Court finds that Plaintiff cannot escape summary judgment on the Section 1983 claims asserted against Day based on the applicable jurisprudence on this issue. For example, in *Doe v. Rains Cnty. Indep. Sch. Dist.*, a principal was sued after a coach had a sexual affair with a fifteen-year-old female student.[103] The principal was aware that the student babysat for the coach. The principal saw the coach walk the student to the bus on one occasion. There was also evidence that the principal asked another coach whether he thought anything was going on between the offending coach and the student. The other coach

---

[103] 76 F.3d 666 (5th Cir.1996).

said he had no idea. Later, another female student told the principal that, while he was taping her for athletics, the coach asked her for a date. The principal also learned that the coach had taken yet another female student out of class to tape her ankle. Finally, the principal saw the fifteen-year-old crying at school, and after informing her parents, learned that the student was having "trouble with a man."[104] The principal had a counselor meet with the student, but she refused to identify the man. The Fifth Circuit held that these facts were insufficient to point plainly toward the conclusion that the coach was sexually abusing the student. By contrast here, even accepting Plaintiff's version of the facts, Day had far less knowledge regarding Davison on the morning of May 16, 1985, the day after police met with Day regarding Plaintiff's report.

Another example of insufficient notice is *Hagan v. Houston Indep. Sch. Dist.*, where the principal was informed by a teacher that a student had reported that he had been "pinched and patted ... on the buttocks by a high school coach.[105] The principal met with the student and the coach, who explained that the touch had merely been a coaches' gesture."[106] The principal did not inform the complaining student's parents. About one month later, a second student reported to a teacher that he had been having sexual relations with the coach. The teacher informed the principal, who met separately with the second student and the coach. The second student confirmed the allegation, but the coach again denied any wrongdoing. The following day, after being bribed by the coach, the second student made a written statement withdrawing the allegation. Then, a few days later, the second student revived the complaint; however, the second student's

---

[104] *Id.* at 667.
[105] 51 F.3d 48 (5th Cir.1995).
[106] *Id.* at 50.

mother told the principal to drop the matter because the relationship between her son and the coach had been consensual. Next, another teacher reported to the principal that the brother of a third student claimed that the coach and the third student were having sexual relations. The principal met with the third student and the coach, both of whom denied the allegation. Finally, a fourth student complained to the principal that the coach "had rubbed his inner thigh, grabbed his penis through his pants and made a number of suggestive comments" while he was in the coach's office. After the District Attorney brought formal charges against the coach, he was removed.[107]

In finding the principal was shielded by qualified immunity, the *Hagan* court noted that overcoming qualified immunity is a "difficult task" for the plaintiffs.[108] The court found that plaintiffs did not show how the principal "could have foreseen any problem" before the first student's complaint.[109] The court determined that it was not until after the third student's complaint that the principal had notice of facts that pointed plainly to the conclusion that the coach was engaging in sexual conduct with students.[110] Nonetheless, despite finding a sufficient basis to conclude that the school principal had "undoubtedly learned of facts or a pattern of behavior" that would point to the conclusion that the teacher was engaging in inappropriate sexual behavior with students,[111] the Fifth Circuit ultimately concluded that the principal's response, although ineffective, did not rise to the level of deliberate indifference because ineffectiveness does not defeat qualified immunity.[112] Here, Plaintiff attempts to distinguish *Hagan*, arguing that the principal there at least took

---

[107] *Id*. at 50-51.
[108] *Id*. at 52.
[109] *Id*.
[110] *Id*.
[111] *Id*.
[112] *Id*. at 52-53.

some action rather than no action, unlike Day who did nothing following notice of the risk. While this is true, the principal in *Hagan* had far more information to act upon, having received multiple reports specifically identifying the coach's actions with multiple, identified students. Those are not the facts of this case.

In *Doe v. Beaumont I.S.D.*, the plaintiffs claimed the principal was deliberately indifferent because he did not remove a teacher from his job after a prior sexual abuse report was made against the teacher.[113]  A memorandum dated August 30, 1993, showed that a student alleged that on August 27, the teacher had "looked under her dress, hugged her, and told her that she was a fine baby."[114]  The memorandum reflected that the principal investigated the claim by holding a conference with a parent of the child and the teacher.  There, the teacher denied the allegations, and evidence existed that challenged the child's credibility, namely by the child's parent, who advised that the child had been sexually abused previously, and that experience likely informed the current sexual abuse claim.[115]  In finding the principal was entitled to qualified immunity, the court stated:

> The court is fully aware of the low threshold of evidence necessary to defeat summary judgment. *But a single instance is not necessarily enough to provide actual, or even constructive, notice to the principal* of an educational institution. *See, e.g., Canutillo I.S.D. v. Leija*, 101 F.3d 393, 402 (5th Cir.1996) (teacher's abusive conduct was not so pervasive that a reasonable juror could find constructive notice, in spite of the fact that the student and her mother had reported the abuse to a teacher). When examining all of the evidence in the light most favorable to Plaintiffs, the evidence shows that, as a matter of law, Traylor did not have sufficient evidence that pointed plainly toward the conclusion that Evans was sexually abusing his students prior to the reports of Janet and Sally Doe.[116]

---

[113] 8 F.Supp.2d at 612.
[114] *Id.* at 604.
[115] *Id.*
[116] *Id.* at 612 (emphasis added).

In the present case, assuming the police visit to Day in May 1985 constitutes concrete notice of the risk, it is only a single instance of purported sexual abuse by Davison, held by the Fifth Circuit to be insufficient to prove actual or constructive notice.

Plaintiff fairly complains that, after the May 1985 meeting with the police, Day "could have" and "should have" advised Davison that he was being watched, asked him about fraternizing with students, and kept a more watchful eye on Davison by telling him to keep his classroom door open or not be alone with students.[117] These failures could support that Day was negligent;[118] however, the test for deliberate indifference is not whether a principal did "all [they] could or should have done, but whether [they] failed to take steps that were 'obviously necessary' under the circumstances."[119] The Fifth Circuit instructs that "the deliberate indifference standard is a high one."[120] "Actions that are 'merely inept, erroneous, ineffective, or negligent do not amount to deliberate indifference.'"[121] Moreover, in adopting the deliberate indifference standard over a gross negligence standard for supervisory liability in Section 1983 cases, the Fifth Circuit explained: "'gross negligence' and 'deliberate indifference' involve different degrees of certainty.... Whereas the former is a 'heightened degree of negligence,' the latter is a 'lesser form of intent.'"[122]

---

[117] Rec. Doc. 71, p. 21.
[118] The Court notes that all state law claims asserted against Day were dismissed in a prior Ruling. *See* Rec. Doc. 30.
[119] *Henry v. Toups*, No. 08-939, 2010 WL 3398857, at *10 (E.D. La. Aug. 23, 2010)(quoting *Taylor Indep. Sch. Dist.*, 15 F.3d 443, 454 (5th Cir.1994) (en banc ); *Hagan*, 51 F.3d 48, 51 (5th Cir.1995)).
[120] *Doe v. Dallas Indep. Sch. Dist.*, 153 F.3d 211, 219 (5th Cir.1998).
[121] *Henry*, 2010 WL 3398857, at *10 (quoting *Doe v. Dallas Indep. Sch. Dist.*, 153 F.3d at 219).
[122] *Taylor Indep. Sch. Dist.*, 15 F.3d at 453, n. 7 (citing *Germany v. Vance*, 868 F.2d 9, 18 n. 10 (1st Cir.1989)).

Importantly, "qualified immunity is not defeated 'even if the harm ultimately was not averted.'[123] It is also not defeated if the supervisor's response was 'ineffective to prevent' the constitutional harm."[124]  The Fifth Circuit declined to find deliberate indifference on the part of a school principal even when the principal erroneously concluded that an allegation was not true; thus, "the principal's actions were ineffective in preventing a teacher from sexually abusing students, even though the erroneous conclusion had tragic consequences."[125]

Notably, there are cases where the Fifth Circuit *has* found a principal's conduct to rise to the level of deliberate indifference sufficient to deny qualified immunity.  For instance, in *Taylor Indep. Sch. Dist.*, the court examined the actions of both the principal and the superintendent. As to the principal, the court concluded that he acted with deliberate indifference based on the following facts. The principal had heard about problems with the coach for two years and, during that time, had only one conference with the coach and told him not to be "too friendly" with the girls.[126] When the principal received parental complaints of favoritism in the classroom, he suggested to the parents that their children were "jealous" of the favorite students.[127] He dismissed the librarian's report of "child molestation" she had personally observed.[128] Instead of transferring the plaintiff, the principal transferred another student who discovered an inappropriate communication from the coach to the plaintiff, and the principal never discussed this incident with anyone.[129] He never recorded any of the substantiated complaints in the

---

[123] *Henry*, 2010 WL 3398857, at *10 (quoting *Farmer v. Brennan*, 511 U.S. 825, 844 (1994)).
[124] *Id.* (quoting *Hagan*, 51 F.3d at 52 (citation omitted)).
[125] *Doe ex rel. Doe v. Dallas Indep. Sch. Dist.*, 220 F.3d 380, 388 (5th Cir. 2000).
[126] 15 F.3d at 456.
[127] *Id.* at 457-457.
[128] *Id.*
[129] *Id.* at 457, n. 13.

coach's personnel file. He never "took the obvious step" of transferring the plaintiff out of the coach's class or directing the coach to stay away from the plaintiff. He heard rumors and received complaints for two years before reporting anything to the superintendent.[130] Under these facts, the Fifth Circuit concluded that a jury could reasonably find that, had the principal responded prior to the time the coach began a sexual relationship with the student, it may not have begun at all. Further, the court also found that a reasonable jury might not credit the principal's testimony about his discussions with the coach based on the coach's failure to remember them.[131] Thus, based upon this history, the Fifth Circuit found that a reasonable jury could conclude that the principal acted with deliberate indifference. But the history of facts known to the principal in *Taylor* are vastly greater and more specific than those ostensibly known by Day here.

Considering the wealth of binding jurisprudence discussed above, and interpreting the facts in the light most favorable to Plaintiff, the Court cannot conclude that Day was deliberately indifferent to an obvious risk. Accordingly, Day's Motion for Summary Judgment is granted.

### C. The School Board's Motion for Summary Judgment

#### 1. Federal Claims under 42 U.S.C. § 1983

"Under § 1983, a municipality or local governmental entity such as an independent school district may be held liable only for acts for which it is actually responsible."[132] To state a claim against a municipality under *Monell v. Department of Social Services of City of New York* and its progeny, Plaintiff must plead that "(1) an official policy (2) promulgated

---

[130] *Id.*
[131] *Id.*
[132] *Doe ex rel. Doe v. Dallas Indep. Sch. Dist.,* 153 F.3d 211, 215 (5th Cir. 1998) (noting that a municipality cannot be held liable under § 1983 on a *respondeat superior* theory)

by the municipal policymaker (3) was the moving force behind the violation of a constitutional right."[133]

An official policy is a policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the government entity or by an official to whom the entity has delegated policy-making authority.[134] "The 'official policy' requirement was intended to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible."[135] A municipality cannot be held liable under § 1983 for the tortious behavior of its employees under a theory of *respondeat superior*.[136] "Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort."[137] "Official municipal policies can take various forms. They often appear as written policies, but an official policy may also be an unwritten but 'widespread practice that is so common and well-settled as to constitute a custom that fairly represents municipal policy.'"[138]  Under this second category, a plaintiff must show "[a]ctual or constructive knowledge of [a] custom" that is "attributable to the governing body of the municipality or to an official to whom that body ha[s] delegated policy-making authority."[139]

Plaintiff's federal claims against the School Board fall into two categories which heavily overlap in evidence and argument: 1) failure to adopt a policy, and 2) failure to

---

[133] *Gomez v. Galman*, 18 F.4th 769, 777 (5th Cir. 2021).
[134] *Doe v. Edgewood Indep. Sch. Dist.*, 964 F.3d at 365, n. 64 (5th Cir. 2020).
[135] *Id.* at 365 (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 479, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986).
[136] *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).
[137] *Id.*
[138] *Gomez v. Galman*, 18 F.4th 769, 777 (5th Cir. 2021).
[139] *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984) (en banc) (per curiam); *see also Valle v. City of Houston*, 613 F.3d 536, 542 (5th Cir. 2010).

train. In instances where the policymaker "fails to act affirmatively at all"—i.e., where there is no policy—the "official policy" requirement may be met "if the need to take some action to control the agents of the local governmental entity 'is so obvious, and the inadequacy [of existing practice] so likely to result in the violation of constitutional rights, that the policymake[r] ... can reasonably be said to have been deliberately indifferent to the need.'"[140] "A failure to adopt a policy can be deliberately indifferent when it is obvious that the likely consequence[ ] of not adopting a policy will be a deprivation of constitutional rights."[141] "Deliberate indifference is a high standard—'a showing of simple or even heightened negligence will not suffice.'"[142]

Here, Plaintiff must show that the School Board had "actual or constructive notice" that a particular omission in policy would cause its "employees to violate citizens' constitutional rights" and that it still chose to omit that policy.[143] A plaintiff may show deliberate indifference in either of two ways. "First, a plaintiff may demonstrate 'that a municipality had notice of a pattern of similar violations.'"[144] "Second, a plaintiff may demonstrate liability based on a single incident if the constitutional violation was the highly predictable consequence of a particular failure [to promulgate a policy]."[145] Moreover: "'Moving force' causation is more than 'but for' causation."[146] It requires that plaintiff show

---

[140] *Burge v. Parish of St. Tammany*, 187 F.3d 452, 471 (5th Cir. 1999) (alteration in original) (quoting *City of Canton v. Harris*, 489 U.S. 378, 390, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)).

[141] *Porter v. Epps*, 659 F.3d 440, 446 (5th Cir. 2011)(quoting *Rhyne v. Henderson Cnty.*, 973 F.2d 386, 392 (5th Cir. 1992)).

[142] *Valle*, 613 F.3d at 542 (quoting *Piotrowski v. City of Houston*, 237 F.3d 567, 579 (5th Cir. 2001)).

[143] *See Porter*, 659 F.3d at 447 (quoting *Connick v. Thompson*, 563 U.S. 51, 61, 131 S.Ct. 1350, 179 L.Ed.2d 417 (2011)); *see also Connick*, 563 U.S. at 62, 131 S.Ct. 1350 (A "'policy of inaction' in light of notice that its program will cause constitutional violations 'is the functional equivalent of a decision by the [defendant] itself to violate the Constitution.'" (citation omitted)).

[144] *Davidson v. City of Stafford*, 848 F.3d 384, 397 (5th Cir. 2017) (quoting *Kitchen v. Dall. Cnty.*, 759 F.3d 468, 484 (5th Cir. 2014)) (failure-to-train case).

[145] *Id.* (internal quotation marks omitted) (quoting *Kitchen*, 759 F.3d at 484).

[146] *Doe v. Beaumont Independent School District*, 727 F.Supp.3d 589, 622 (E.D. Tex. 2024)(quoting *Doe*, 964 F.3d at 365)).

that the final policymaker had the requisite degree of culpability—deliberate indifference—and that the policy in question was the actual cause of the constitutional violation.[147] It is insufficient for a plaintiff to merely identify conduct that is "properly attributable" to the municipality.[148] Rather, there must be a "direct causal link."[149]

"[T]here are limited circumstances in which an allegation of a 'failure to train' [or failure to supervise] can be the basis for liability under § 1983."[150] To succeed on a failure-to-train or failure-to-supervise claim, a plaintiff must show: (1) the training procedures or supervision of employees was inadequate, (2) a causal link between such failure and the violation of plaintiff's constitutional rights, and (3) such failure amounts to deliberate indifference.[151] "'Deliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action."[152] Accordingly, when a municipality's policymakers have actual or constructive notice that a particular omission in their training program causes municipal employees to violate citizens' constitutional rights, the municipality may be deemed deliberately indifferent if the policymakers choose to retain that program.[153]

As with inadequate policy cases, "[p]roof of more than a single instance of the lack of training or supervision causing a violation of constitutional rights is normally required before such lack of training or supervision constitutes deliberate indifference."[154] In the absence of a pattern of similar violations, on rare occasions, a plaintiff may "establish

---

[147] *Id.*
[148] *Id.* (quoting *Board of the County Com'rs of Bryan Cty, Okla. v. Brown*, 520 U.S. 397, 404 (1997)).
[149] *Id.* (quoting *Brown*, 520 U.S. at 404).
[150] *City of Canton, Ohio v. Harris*, 489 U.S. 378, 387 (1989).
[151] *Goodman v. Harris Cnty.*, 571 F.3d 388, 395 (5th Cir. 2009) (citation omitted).
[152] *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (brackets and citation omitted).
[153] *Id.*
[154] *Thompson v. Upshur Cnty.*, 245 F.3d 447, 459 (5th Cir. 2001).

deliberate indifference through the single-incident exception."[155] To fit within this "extremely narrow" exception, the plaintiff must show "that the highly predictable consequence of a failure to train would result in the specific injury suffered."[156] "For a violation to be 'highly predictable,' the municipality 'must have failed to train its employees concerning a clear constitutional duty implicated in recurrent situations that a particular employee is certain to face.'"[157] "The single-incident exception 'is generally reserved for those cases in which the government actor was provided no training whatsoever.'"[158] Similarly, to establish liability for failure to supervise, "it must have been obvious that the highly predictable consequence of not [supervising the employees] was that they would" commit the specific constitutional violation alleged.[159]

The School Board moves for summary judgment on Plaintiff's Section 1983 claims, arguing that Plaintiff has failed to present evidence that the violation of his rights was caused by an official policy, practice, or custom of the School Board. The School Board contends that the purported evidence of four instances of prior sexual abuse of students by teachers from 1980-1985 is insufficient to establish a persistent, widespread, or so common and well-settled custom that fairly represents municipal policy.[160] The School Board relies on Fifth Circuit jurisprudence holding that a plaintiff must show "a pattern of abuses that transcends the error made in a single case."[161] "A pattern requires similarity and specificity; '[p]rior indications cannot simply be for any and all "bad" or unwise acts,

---

[155] *Hutcheson v. Dall. Cnty.*, 994 F.3d 477, 482 (5th Cir. 2021).
[156] *Valle*, 613 F.3d at 549 (emphasis omitted).
[157] *Hutcheson*, 994 F.3d at 482-83 (quoting *Littell v. Hous. Indep. Sch. Dist.*, 894 F.3d 616, 624-25 (5th Cir. 2018)).
[158] *Id.* at 483 (quoting *Peña v. City of Rio Grande City*, 879 F.3d 613, 624 (5th Cir. 2018)).
[159] *Peterson v. City of Fort Worth, Tex.*, 588 F.3d 838, 850 (5th Cir. 2009)(internal quotation marks and citation omitted).
[160] Rec. Doc. 66-1, p. 14 (quoting *Piotrowski*, 237 F.3d at 579).
[161] *Peterson*, 588 F.3d 838, 850-51 (5th Cir. 2009) (quoting *Piotrowski,* 237 F.3d at 582).

but rather must point to the specific violation in question.'"[162]

The School Board also argues Plaintiff has failed to present evidence of action or inaction of a policymaker since Day's conduct cannot be attributed to the School Board. The School Board further maintains that Plaintiff has failed to present summary judgment evidence that a purported policy (or lack thereof) was the "moving force" behind the constitutional violation Plaintiff suffered. The School Board argues that the evidence in this case shows only that Davison's conduct was personal, unforeseeable, and in direct contravention of School Board policy.  Further, as soon as the School Board was notified of Davison's conduct, he was immediately arrested. Considering that deliberate indifference is an extremely high standard, the School Board contends it was not on notice of any excessive risk to Plaintiff's (or other students') health or safety.  The rumors Day heard in the past, and the limited information the police reported to Day during their investigation of Plaintiff's report, do not indicate an excessive risk such that it satisfies the stringent deliberate indifference standard.

Plaintiff contends the School Board's policy or custom was to provide no training whatsoever regarding sexual abuse of students. Plaintiff maintains the School Board was aware of at least four prior incidents of sexual misconduct with minors by teachers between 1980 and 1985.  Plaintiff claims the School Board "acknowledge[d]" this awareness of two specific cases, and the problem was not general but specific to instances of teacher-on-student sexual abuse occurring on campus and during school hours.[163] Despite this purported knowledge, Plaintiff maintains that the School Board

---

[162] *Skinner v. Ard*, 519 F.Supp.3d 301, 313 (quoting *Peterson*, at 851) (quoting *Estate of Davis ex rel. McCully v. City of North Richland Hills*, 406 F.3d 375, 383 (5th Cir. 2005)).
[163] Rec. Doc. 70, pp. 20-21.

failed to implement a policy or provide training to address this problem.

Plaintiff attempts to distinguish the jurisprudence regarding the number of similar incidents required to demonstrate a pattern, arguing that the facts in those cases spoke to a lack of similarity in the specificity of incidents and did not create a brightline test that any specific number is too great or too little.[164] Plaintiff contends that, while the single-incident exception could apply here, he does not need to rely on it to survive summary judgment based on the "two or four" cases between 1980-1985, and the "constructive, if not actual, knowledge" that sexual abuse "was a problem throughout the East Baton Rouge Parish school system."[165] Plaintiff claims that, in addition to the information the School Board possessed since 1974 about Davison's suspicious conduct, the "totality of the circumstances" placed the School Board on notice of the need to implement policies and training regarding sexual abuse of students.[166]

The School Board responds, arguing that Plaintiff's only "evidence" of the School Board's alleged notice of these other sexual abuse incidents is based on newspaper articles which are not competent summary judgment evidence. Accordingly, they cannot serve as evidence of the School Board's notice of these other allegations. Moreover, even if the articles could be considered, they do not speak to the specifics of any system-wide policy or training deficiencies. As for the School Board's purported acknowledgment, the School Board challenges Plaintiff's characterization of this as fact since the School Board only acknowledged its *current* awareness of these other incidents after the newspaper article were produced in discovery. The School Board posits:

---

[164] *Id.* at p. 21.
[165] *Id.* at pp. 22-23.
[166] *Id.* at p. 23.

"Awareness of allegations in litigation does not show that the allegations were substantiated or that the School Board had prior notice of them. Plaintiff has not, and cannot, produce any evidence showing the School Board knew of these allegations before the subject incident."[167]  That recent lawsuits have been filed also fails to establish policy and training procedures and/or deficiencies from the 1980s because they are not evidence showing when the alleged perpetrators "were hired, what policies governed at that time, or what training they received."[168]  And finally, even assuming all Plaintiff's evidence was admissible, four to five incidents spanning five years does not establish a pattern to sustain municipal liability.  While the precise size and makeup of the East Baton Rouge Parish School System in the 1980s is unknown, it easily included hundreds of teachers and thousands of students; four incidents of alleged sexual abuse by teachers during a five year time span – two of which were unknown to the School Board until 2024 – does not demonstrate the type of widespread, persistent pattern required by *Monell*.

The School Board highlights the fact that Louisiana's current statutory framework governing the reporting and prevention of child abuse did not exist at the time of Plaintiff's assault. Additionally, the Louisiana Children's Code, which established mandatory reporting requirements for suspected child abuse and neglect, was not enacted until 1992.[169] Notably, the specific provision that requires teachers to receive instruction on identifying and reporting child abuse as a condition of certification was not added until 2003.[170] The School Board contends that "[t]he lack of formalized state-mandated training standards at that time underscores that the School Board's alleged failure to train cannot,

---

[167] Rec. Doc. 73, p. 6.
[168] *Id.*
[169] *See* La. Ch. C. art. 601 *et seq*.
[170] *See* La. Ch. C. art. 603.1.

as a matter of law, constitute deliberate indifference."[171]

The Court finds that the School Board is entitled to summary judgment on Plaintiff's *Monell* claims because Plaintiff has failed to present competent summary judgment evidence that a widespread practice, pattern, or custom of student sexual abuse by teachers existed within the school system at the relevant time such that the School Board had notice of such a serious risk and the need to develop responsive policies and/or training.  Plaintiff offered four or five incidents of sexual abuse occurring between 1980 and 1985. Even setting aside admissibility issues and Plaintiff's failure to present evidence of the School Board's actual knowledge of these other incidents, Plaintiff has the burden of showing that such incidents "are 'sufficiently numerous' and have 'occurred for so long or so frequently that the course of conduct warrants the attribution to the governing body of knowledge that the objectionable conduct is the expected, accepted practice of [school district] employees.'"[172] The incidents presented here are simply inadequate evidence of "the persistent, often repeated, constant violations that constitute custom and policy."[173] Further, while not dispositive, the Court finds it relevant that the State of Louisiana lacked any statutory framework for training and reporting on these issues during the relevant time period.[174]

---

[171] Rec. Doc. 73, p. 8.
[172] *Robinson v. Midland County*, 80 F.4th 704, 710 (5th Cir. 2023) (quoting *Martinez v. Nueces County*, 71 F.4th 385, 389 (5th Cir. 2023)), *cert. denied*, 144 S. Ct. 1010 (2024).
[173] *Jackson v. Valdez*, 852 F. App'x 129, 135-36 (5th Cir. 2021) (concluding that six total incidents over a period of five years were "isolated violations" insufficient to support a *Monell* claim (quoting *Bennett*, 782 F.2d at 768 n.3)); *Henderson v. Killeen Indep. Sch. Dist.*, No. A-13-ca-471-LY, 2013 WL 6628630, at *3 (W.D. Tex. Dec. 16, 2013) ("Two isolated incidents clearly do not constitute a pattern of unconstitutional conduct sufficient to hold [the school district] liable under § 1983.").
[174]  *Zarnow v. City of Wichita Falls*, 614 F.3d 161, 171 (5th Cir. 2010)(Compliance with state requirements is a factor counseling against a finding that training is inadequate.).

For the same reason, Plaintiff's failure-to-train claim fails. For the School Board to be liable on this claim, it must have actual or constructive notice of ongoing constitutional violations at the school; otherwise, the Board's failure could not be a conscious or deliberate choice.[175] The failure-to-train argument fails due to the lack of competent summary judgment evidence that the Board was aware of the incidents discussed. There was no pattern of constitutional violations such that the Board would have been more than grossly negligent for failing to train or supervise its employees regarding teacher on student sexual abuse.[176]

There is also insufficient evidence in the record to determine whether any failure to train was widespread. It is undisputed that Day could not recall whether he was trained on sexual abuse issues as he proceeded through his employment with the School Board. However, Day was hired by the School Board in 1964 to teach at Central High School.[177] Day received a Master's Degree in Education in 1968 and returned to Southeast in an administrative role. While Day did not recall if the employee handbook he was given contained information regarding teacher/student relationships, he testified that he did not recall a written policy "other than the principal telling, you know, at the beginning of each year, Make sure you don't, you know, fraternize."[178] Day retired from the School Board in 1994.[179]

In his deposition, Day was asked to recall training that would have begun 61 years ago. His promotion to administrator occurred 57 years ago. At the time this lawsuit was

---

[175] *See Porter v. Epps*, 659 F.3d 440, 447 (5th Cir.2011).
[176] *See Estate of Davis ex res. McCully v. City of North Richland Hills*, 406 F.3d 375, 381 (5th Cir. 2005).
[177] Rec. Doc. 65-4, p. 22.
[178] *Id.* at pp. 43-44.
[179] *Id.* at p. 11.

filed, Day had been retired from the School Board for nearly 30 years. And based on Day's testimony, Plaintiff urges this Court that "all reasonable inferences suggest that the other teachers working under Day, including Sharon Story, Irene Smith and Faye Wicker, never received any training from the School Board" on sexual abuse of students.[180] This is a leap the Court cannot make.  Day's failure to recall specific training from 50-60 years ago does not establish a widespread pattern or practice that all School Board employees were not trained on this issue. Moreover, in *DOE V. Beaumont ISD*, the plaintiff survived summary judgment against the School Board on the failure-to-train claim because the plaintiff presented testimony of "several BISD employees that they did not receive or did not recall receiving training that was specific to identifying and reporting teacher-student sexual harassment and abuse and that the training they received had not changed over time."[181]  The Court has before it only Day's testimony regarding events that occurred several decades earlier.

Shamlin's testimony does not establish this pattern either. Shamlin became a third-grade teacher in East Baton Rouge Parish in 1989, then pursued other degrees including a law degree, and returned to employment with School Board as a teacher in 1994.[182] As current General Counsel for the School Board and the designated Rule 30(b)(6) representative, Shamlin was admittedly unaware of School Board policies and/or training programs in existence in 1985.[183] However, Shamlin generally answered several hypothetical questions about what "could have"  or "should have" been done in 1985.

---

[180] Rec. Doc. 70, p. 13.
[181] 727 F.Supp.3d 589, 626.
[182] Rec. Doc. 71-1, p. 25.
[183] *See id.* at pp. 50-53, 62, 64-65, 67, 91-93, 106, 117, 138, 144-150, 158, 166, 169-172, 175, 207, 210-214, 217, 218, 228, 238, 245

Accepting Plaintiff's characterization of Shamlin's testimony as true, it remains insufficient to show deliberate indifference. As the Supreme Court has stated, "In virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident."[184] Critically, Shamlin did not testify that any of today's policies and acceptable practices were in place in 1985. Plaintiff cannot carry the heavy burden of showing deliberate indifference by imposing 2025 policies and practices on events and circumstances that took place in 1985.

Because the Court has found that there is no summary judgment evidence of a policy, it need not consider the other *Monell* requirements. Accordingly, the School Board's summary judgment on Plaintiff's Section 1983 claims is granted.

### 2. Negligence claims

Plaintiff contends the School Board is negligent under Louisiana law for negligent training, retention and supervision.[185] Plaintiff asserts that the School Board is independently liable for failing to properly supervise Davison and failing to train Day and its other employees to recognize and prevent sexual abuse of students. Under Louisiana law, the duty-risk analysis applies to claims of negligent hiring, training, and supervision.[186] The elements of a Louisiana negligence claim are: (1) duty; (2) breach of duty; (3) cause-in-fact; (4) scope of liability or scope of protection; and (5) damages.[187] Employers have a duty to exercise reasonable care in hiring, retaining, and supervising

---

[184] *City of Canton*, 489 U.S. at 392 (quoted in *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 453 (5th Cir.1994)).
[185] Rec. Doc.70, p. 9.
[186] *See Roberts v. Benoit*, 605 So. 2d 1032, 1041 (La. 1992).
[187] *Gomez v. Galman*, 18 F.4th 769, 780 (5th Cir. 2021).

employees.[188] "When an employer hires an employee who in the performance of his duties will have a unique opportunity to commit a tort against a third party, he has a duty to exercise reasonable care in the selection of that employee."[189] "The primary focus is whether the 'the employment gave the tortious/criminal employees "unique opportunities" to commit their wrongdoing.'"[190]

Notably, in the context of schools, Louisiana courts have held:

Schools and school boards, through their employees or teachers, owe a duty of reasonable supervision over students. The supervision required is reasonable, competent supervision appropriate to the age of the children and the attendant circumstances. However, this duty does not make the school or school board the insurer of the safety of the children. Constant supervision of all students is not possible or required for employees or teachers to discharge their duty to provide adequate supervision. Before liability can be imposed upon a school or school board for failure to adequately supervise the safety of students, there must be proof of negligence in providing supervision and also proof of a causal connection between the lack of supervision and the accident. Further, the unreasonable risk of injury must be foreseeable, constructively or actually known, and preventable, if the requisite degree of supervision had been exercised.[191]

### a. Failure to Supervise Davison

The School Board argues there is no evidence that the risk Davison posed to students was foreseeable, constructively or actually known, or was preventable had the requisite supervision been exercised.  The School Board focuses on the lack of foreseeability, arguing that "discovery confirms that before May 1985, no student, parent, or employee at Southeast ever reported Davison for inappropriate conduct with students."[192]  Before Plaintiff's assault, the School Board maintains that the only

---

[188] *Roberts*, 605 So. 2d at 1041.
[189] *Kelley v. Dyson*, 08-1202, p. 7 (La. App. 5 Cir. 3/24/09), 10 So.3d 283, 287; *see Gomez*, 18 F.4th 769 at 780.
[190] *Gomez*, 18 F.4th at 780 (quoting *Kelley*, 10 So.3d at 287-88).
[191] *Doe v. E. Baton Rouge Par. Sch. Bd.*, 2006-1966 (La. App. 1 Cir. 12/21/07), 978 So. 2d 426, 433, *writ denied*, 2008-0189 (La. 3/28/08), 978 So. 2d 306 (internal citations omitted).
[192] Rec. Doc. 66-1, p. 7.

information it had regarding Davison "consisted of decade-old, community-level rumors that Davison was 'suspected of being homosexual, or being gay.' These vague, dated, and non-student-specific rumors do not suggest, much less make foreseeable, the sexual assault of a particular student during P.E."[193]

Plaintiff counters that, given what the School Board knew about Davison since 1974, sexual abuse of students was a foreseeable consequence of the failure to supervise and protect.[194] He claims that a reasonable jury could infer from the School Board's reaction to the 1974 rumors that the risk of sexual misconduct with children was a possibility. Even though Day maintains these rumors concerned only Davison's purported homosexuality, they were serious enough to warrant a visit by law enforcement; Assistant Superintendent Smiley instructed Day to "keep your eyes, ears open" regarding Davison;[195] Day sought Davison out periodically to ask about inappropriate contact with students; and Day felt the need to remind Davison at the beginning of every year not to have relationships with students.

The Court agrees that there is summary judgment evidence in the record from which a reasonable jury could conclude that the School Board was aware in 1974 that Davison needed heightened supervision. The statements and actions by Smiley and Day following these rumors indicate an awareness of a risk that was not based on Davison's homosexuality but his interactions with neighborhood children. While the evidence of sexual misconduct in 1974 is not overt, there is evidence in the record from which a reasonable jury could infer that implication. When evidence is subject to different

---

[193] *Id.* (quoting Rec. Doc. 65-4, pp. 126-128).
[194] Rec. Doc. 70, p. 10.
[195] Rec. Doc. 65-4, p. 127.

interpretations, it is the role of the jury, not the Court, to evaluate that evidence. Accordingly, summary judgment as to this claim is denied.

b.    *Failure to Train Day/Other Employees*

Plaintiff also claims the School Board failed to properly train Day and other teachers on suspected sexual abuse of students.  The Eastern District of Louisiana recently set forth the important distinction between a Section 1983 failure to train claim and a general negligent failure to train under Louisiana law:

> To be clear, a claim for negligent training under state law is completely different from the failure-to-train theory of *Monell* liability analyzed above. As explained by the Fifth Circuit, "Louisiana's test for whether a duty exists for these [negligent hiring and training] claims is different than the test for whether [plaintiff] states a *Monell* claim." *Gomez v. Galman*, 18 F.4th 769, 780 (5th Cir. 2021). That is, in the context of a § 1983 claim, a failure-to-train theory of *Monell* liability is a specific standard requiring a plaintiff to prove "deliberate indifference" by connecting a particular constitutional violation to a municipality's training inadequacies through either a pattern of similar incidents or the single incident exception. *See supra*, at 19-25. Conversely, a state-law negligent training claim is based in ordinary state negligence principles and requires no such formulaic and particularized showing. *See Warren v. Penzone*, No. 22-2200, 2023 WL 7686666, at *13 (D. Ariz. Nov. 15, 2023) ("[A] pattern of prior similar incidents is ordinarily required to establish the sort of deliberate indifference necessary to support a *Monell* claim. But such a pattern is not required to support a state-law negligent training claim. To prevail on such a claim, a plaintiff need only demonstrate 'that a defendant's training or lack thereof was negligent and that such negligent training was the proximate cause of the plaintiff's injuries.'").[196]

Plaintiff argues "all reasonable inferences suggest that the other teachers working under Day … never received any training from the School Board on recognizing, investigating, supervising, training, reporting or preventing sexual abuse of students."[197] Plaintiff contends that if such training was provided, his sexual abuse could have been

---

[196] *A.F. by and through J.F. v. St. Tammany Parish School Board*, 2025 WL 1220805, *15 (E.D. La. Apr. 28, 2025).
[197] Rec. Doc. 70, p. 13.

avoided. But the only testimony regarding training was about Day's training; no evidence was introduced about general training policies in 1985, and Shamlin testified that he is unaware of School Board training policies in 1985.[198]

The School Board responds that there is no evidence, including prior to Davison's hiring until his arrest, of any complaints from parents, students, or staff regarding sexual misconduct with any student, including Plaintiff. Further, there is no evidence connecting a lack of training to Davison criminal conduct of committing sexual assault. The School Board maintains Plaintiff's injuries resulted from Davison's independent, unforeseeable, criminal misconduct—not from any negligent hiring, retention, or training deficiency.

The Court finds that a reasonable jury could find from the evidence in this case that Day was not properly trained to supervise problematic teachers or protect students from sexual assault. During his decades of employment with the School Board, including his promotion to administrative roles, Day could not recall ever receiving training regarding sexual abuse or suspected sexual abuse of students or children.[199] He could not recall ever receiving information relating to rules or regulations regarding sexual relationships with students.[200] Day could not recall whether the School Board employee handbook he received during the relevant time period mentioned sexual abuse.[201] When Day left teaching and began administrative roles with the School Board, he received no additional training.[202] Day acknowledged that he was given a test in 1967 or 1968 to become an administrator, but the subject matter of the test had nothing to do with

---

[198] *See* Rec. Doc. 71-1, pp. 50-53, 62, 64-65, 67, 91-93, 106, 117, 138, 144-150, 158, 166, 169-172, 175, 207, 210-214, 217, 218, 228, 238, 245.
[199] Rec. Doc. 65-4, p. 91.
[200] *Id.* at pp. 43-44.
[201] *Id.* at p. 91.
[202] Rec. Doc. 65-4, pp. 62, 82, 88-89; Rec. Doc. 71-1, pp. 308-316.

administrative responsibilities.[203]  As the Court previously acknowledged, the massive time span between the training periods at issue and when Day was asked to recall may render his testimony unhelpful; however, it is for the jury to decide.  Accordingly, because it is for the jury to determine if the School Board was negligent in the training it provided (or failed to provide) Day, and if so, whether that lack of training was the cause in fact of Plaintiff's injury, summary judgment is denied on this claim.

### 3.  Vicarious liability claims

Under Louisiana law, an employer is liable for the acts of its employee committed in the course and scope of his employment.[204] These two terms are not synonymous. Rather, the course of employment refers to the time and place of the conduct; the scope of employment refers to the employment-related risk of injury.[205] "[A]n employee's conduct is within the course and scope of employment if the conduct is of the kind that the employee is employed to perform, occurs substantially within the authorized limits of time and space, and is activated at least in part by a purpose to serve the employer."[206] When determining whether an employer could be vicariously liable for an intentional tort committed by its employee, courts look to whether: (1) the tortious act was primarily employment rooted, (2) reasonably incidental to the performance of the employee's duties, (3) occurred on the employer's premises, and (4) occurred during the hours of employment.[207] However, this is not an exclusive list of factors.[208] The Louisiana Supreme Court has stated, "The particular facts of each case must be analyzed to determine

---

[203] Rec. Doc. 65-4, pp. 29-31; Rec. Doc. 71-1, pp. 308-316.
[204] *LeBrane v. Lewis*, 292 So.2d 216, 217–18 (La. 1974).
[205] *Benoit v. Capitol Mfg. Co.*, 617 So.2d 477, 479 (La. 1993).
[206] *Crawford v. Wal-Mart Stores, Inc.*, No. 10-805-M2, 2011 WL 3206196, at *2 (M.D. La. July 26, 2011).
[207] *Id.*
[208] *Miller v. Keating*, 349 So.2d 265, 268 (La. 1977).

whether the employee's tortious conduct was within the course and scope of his employment."[209] Essentially, once it is established that the employee acted within the course of his employment, the employer's vicarious liability hinges on whether the "purpose of serving the employer's business actuated the employee to any appreciable extent."[210]

The decision in *T.S. v. Rapides Par. Sch. Bd.*,[211] is directly on point. There, the school board was sued by a female sophomore in high school who was subjected to sexually inappropriate comments, groped, and "French-kissed" by a teacher on two separate occasions during school. In defending the plaintiff's vicarious liability claim, the school board argued that the teacher was not acting in the course and scope of his employment because the victim was not one of *his* students.[212] The court rejected this "feeble" and "far-fetched" argument and opined:

> The supreme court has explained that being in the "course of employment" relates to time and place while the "scope of employment" relates to determining whether the conduct is an employment-related risk of injury. *Benoit v. Capitol Mfg. Co.*, 617 So.2d 477 (La.1993); *Orgeron v. McDonald*, 93–1353 (La.7/5/94), 639 So.2d 224. Both sexual assaults upon Plaintiff occurred at school, in a classroom, during the school day hours, while the defendant teacher was engaged in assisting that student and a fellow teacher with school business. We cannot say the trial court manifestly erred in finding Lebeouf's conduct sufficiently employment-related so as to impose vicarious liability on his employer, the School Board. LeBeouf's conduct while interacting with a female student in his classroom during school hours when that student and LeBeouf were clearly engaged in school business, was, indeed, so closely related in time, place, and causation to Lebeouf's employment duties as a teacher, as to be regarded a risk of harm fairly attributable to the School Board's business. *See LeBrane*, 292 So.2d 216.[213]

---

[209] *Baumeister v. Plunkett*, 95-2270, p. 4. (La. 5/21/96), 673 So. 2d 994, 997.
[210] *Crawford*, 2011 WL 3206196, at *2 (citing *Johnson v. Littleton*, 45,323 (La. App. 2 Cir. 5/19/10) 37 So. 3d 452).
[211] No. 08-1359, 11 So.3d 628 (La. App. 3 Cir. 6/3/09).
[212] *Id.* at 631.
[213] *Id.*

The summary judgment evidence presented in this case reflects that Davison's access to Plaintiff was at least similar, if not greater given his position of authority, to that seen in *Booth v. Orleans Parish School Board*, which involved vicarious liability claims against a school board for a janitor's alleged sexual assault of a child on school property.[214] In determining whether the tortious conduct was reasonably incidental to the performance of the janitor's employment duties, the court considered testimony establishing that the janitor possessed keys to premises and was allowed free access to the school grounds and buildings. His status as a janitor was said to have provided him access to the young children who attended the school and, "[g]iven his prominent presence on the school's campus and the fact that he was an adult, it is natural that an eight year old child would view him as an authority figure" and not question his directives.[215] The court held that the school board could be found vicariously liable for the janitor's misconduct, and summary dismissal was improper.[216]

The same result is mandated here.  It is undisputed that Plaintiff's sexual abuse by Davison occurred at Southeast, where Davison was employed and where Plaintiff was a student; during school hours; and in a manner that would not have been possible without the authority given to Davison via his employment by the School Board. Davison's employment put him in a position of trust and gave him access to and control of children on School Board premises. There is competent summary judgment evidence in the record from which a reasonable jury could conclude that the School Board is vicariously liable for Davison's conduct.

---

[214] No. 2009-1505 (9/22/10), 49 So.3d 919.
[215] *Id.* at 922.
[216] *Id.*

III.    **CONCLUSION**

For the foregoing reasons, Defendant Richard Day's Motion for Summary Judgment is GRANTED.[217] Defendant East Baton Rouge Parish School Board's Motion for Summary Judgment is GRANTED as to the Section 1983 claims, including punitive damages, but is DENIED as to the state law claims.[218]

**IT IS SO ORDERED.**

Signed in Baton Rouge, Louisiana this 9th day of February, 2026.

**CHIEF JUDGE SHELLY D. DICK**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

---

[217] Rec. Doc. 65.
[218] Rec. Doc. 66.